80. Defendant, Town of Holliston, is a public water provider under the laws of the Commonwealth of Massachusetts. The Town of Holliston has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

81. Defendant, Massasoit Hills Trailer Park, Inc., is a public water provider under the laws of the Commonwealth of Massachusetts. Massasoit Hills Trailer Park, Inc. has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

82. Defendant, Town of Merrimac, is a public water provider under the laws of the Commonwealth of Massachusetts. The Town of Merrimac has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

83. Defendant, City of Methuen, is a public water provider under the laws of the Commonwealth of Massachusetts. The City of Methuen has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

84. Defendant, Town of Mills, is a public water provider under the laws of the Commonwealth of Massachusetts. The Town of Mills has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others.

others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

94. Defendant, Sudbury Water District, is a public water provider under the laws of the Commonwealth of Massachusetts. The Sudbury Water District has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

95. Defendant, Town of West Bridgewater, is a public water provider under the laws of the Commonwealth of Massachusetts. The Town of West Bridgewater has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

96. Defendant, Westport Federal Credit Union, is a public water provider under the laws of the Commonwealth of Massachusetts. Westport Federal Credit Union has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

97. Defendant, Town of Weymouth, is a public water provider under the laws of the Commonwealth of Massachusetts. The Town of Weymouth has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

98. Defendant, Town of Wilmington is a public water provider under the laws of the Commonwealth of Massachusetts. The Town of Wilmington has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

99. Defendant, Town of Yarmouth, is a public water provider under the laws of the Commonwealth of Massachusetts. The Town of Yarmouth has filed the aforementioned joint state court action in the Massachusetts Superior Court, Suffolk County, against Plaintiffs and others. In this joint state court action, this Defendant has asserted MTBE product liability claims against Plaintiffs and others.

100. When the term "Defendants" is used alone, it refers to all Defendants named herein collectively.

### Jurisdiction and Venue

101. An "actual controversy" exists between the Plaintiffs and the Defendants, within the meaning of 28 U.S.C. § 2201: Plaintiffs seek, *inter alia*, this Court's declaration that, due to the Federal Government's comprehensive regulation of fuel-content and fuel additives, the oxygenate mandates, and the Clean Air Act's regulatory scheme and objectives, state law claims and causes of action based upon the refining, distributing and marketing of gasoline containing MTBE, such as those asserted by the Defendants, are preempted under the Supremacy Clause of the United States Constitution.

102. This Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1331, inasmuch as the Federal Government's pervasive regulatory occupation of the field of fuel content and oxygenate use in gasoline means Plaintiffs' claim arises under the "Constitution, laws, or treaties of the United States."

-25-

103. This Court also has jurisdiction over this controversy pursuant to 28 U.S.C. § 1332, inasmuch as:

- the object of this controversy and the declaratory judgment sought far exceeds the sum or value of $75,000, exclusive of interest and costs; and,
- there is complete diversity of citizenship as between Plaintiffs and Defendants.

104. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because the Defendant resides in this judicial district for venue purposes.

### Summary of Facts

### Refining, Distributing and Marketing Gasoline is a Complex International and National Industry.

105. Combined, refined petroleum products and natural gas provide the United States with over 60% of its total energy consumption.

106. Crude oil is recovered from beneath the earth's surface in thousands of locations around the world, both on land and under the seabed.

107. After being brought to the surface, oil is transported to refineries, primarily through pipelines or in ocean-going vessels.

108. There are several hundred petroleum refineries around the world. There are approximately 150 petroleum refineries in the United States, of which approximately 110 refine "finished" gasoline for sale to the consuming public.

109. At any given petroleum refinery, the process of extracting the correct range of hydrocarbons from crude oil and producing finished gasoline is a complex mechanical and chemical process involving a number of different steps through a number of different process units. Given the size, volume, and complexity of these operations and process units, adjustments and changes to the process to alter or modify the content of a petroleum product, like gasoline, frequently require extensive planning, intensive effort, and significant capital investment.

110. Beyond the physical production of gasoline, the significant differences in types of crude oil, refinery configurations, and types of gasoline required make gasoline supply planning and logistics very complex. For instance, there are generally three major octane grades of gasoline: regular unleaded; mid-grade unleaded; and premium unleaded. In addition, gasoline is generally categorized as conventional, oxygenated (*i.e.*, compliant with the Federal Government's Oxy-Fuel Program requirements), and reformulated (*i.e.*, compliant with the Federal Government's Reformulated Gasoline Program requirements). Thus, practically every refiner must produce at least nine separate types of gasoline. Moreover, additional federal fuel content requirements, such as those relating to Reid Vapor Pressure of gasoline, must be satisfied and these vary depending upon the season and the particular market within which gasoline is to be sold. These requirements are established directly by the USEPA in its regulations, or through State Implementation Plans under the Clean Air Act, which must be reviewed and approved by the USEPA before they become enforceable.

111. Refineries are typically located either near raw material sources (such as in Texas, Louisiana or California), or near major centers of consumption (such as Chicago, San Francisco, and New York City). Thus, much of the gasoline consumed throughout the South, Midwest, and Eastern Seaboard States is typically refined, for instance, in Texas and Louisiana.

112. Once refined, gasoline is distributed from refining centers by pipelines, marine tankers, barges, railcars, and tank trucks. Generally, gasoline is delivered from approximately 110 refineries within the United States either directly to service stations near refineries or to outlying storage terminals. There are over 70,000 miles of product pipeline throughout the United States used, in part, to deliver gasoline to various terminals.

113.   There are more than 180,000 retail gasoline service stations within the United States. These services stations, which typically have from three to six or more large storage tanks, receive bulk deliveries on a frequent basis, sometimes as often as several times a day.

114.   In addition to retail service stations, large gasoline consumers, such as those operating fleets of cars, frequently take bulk deliveries directly from storage terminals.

**Fuel Content Regulation by the Federal Government is Both Pervasive and Fundamental to the Gasoline Supply Chain**

115.   In 1977, Congress amended the Clean Air Act to federalize requirements concerning fuels content, by adding what has been codified as 42 U.S.C. §7545. Congress enacted pervasive federal controls relating to fuel content due, in large measure, to the combination of the Federal Government's establishment of Federal automobile emission standards and its decision to phase out and eliminate the use of lead in gasoline throughout the United States. Thus, to ensure these objectives, a national approach to overseeing and controlling the entire content of all gasoline sold in the United States was essential.

116.   Section 7545 empowers the Administrator of the USEPA (the "Administrator") to require all fuels and fuel additives to be registered with the USEPA. Section 7545 prohibits the sale of any fuel or fuel additive anywhere in the country that has not been registered with the Administrator.

117.   Section 7545 furthers permits the Administrator to require those seeking to register fuels and fuel additives to conduct and provide test results prior to accepting any registration.

118.   Under Section 7545, the Administrator is empowered to evaluate and prohibit the manufacture, distribution or sale of any fuel or fuel additive which the Administrator determines

may create air pollution that threatens human health or the environment, or which may impair any automobile emission control device.

119. MTBE was registered with and approved by the USEPA for use as a fuel additive in 1979, primarily as a source of additional octane to be used in light of the elimination of lead as an octane enhancer.

120. Section 7545(c)(4)(A) prohibits States from adopting, for motor vehicle emission control purposes, any control or prescription relating to any characteristic or component of fuel if the Administrator has determined that no such control is appropriate or, if a federal control has otherwise been adopted, the State's proposed control is not identical to the federal control.

121. To the extent States wish to adopt any such controls, they may do so only through their State Implementation Plans under the Clean Air Act, which, in turn, must be reviewed and approved by the USEPA before they may be enforced.

122. The USEPA's regulations pertaining to fuel content and fuel additives registrations, testing, and specifications, which cover more than 400 pages of the Code of Federal Regulations, are set forth at 40 C.F.R. Parts 79 and 80.

123. Ensuring compliance with federal fuel content requirements has a widespread impact on the gasoline supply chain. Pursuant to federal law, gasoline that is completely appropriate for sale in one location cannot legally be sold in another. Thus, for instance, depending upon the time of year, gasoline that may be legally sold in Buffalo, New York or Miami, Florida, may not be sold in Chicago, Illinois or New York City, New York.

124. Fuel content requirements can and have, in certain instances, exacerbated supply problems. Areas which require specialized blends of gasoline under existing federal requirements can be subjected to greater supply deficiencies when supply problems arise. Thus,

for instance, when there is a disruption in the normal gasoline supply to the greater Chicago, Illinois area, adequate other sources of gasoline may not be immediately available because the gasoline required in the Chicago market, by virtue of federal requirements, is a specialized oxygenated blend. Insufficient supply results in increased prices, with consequent adverse economic consequences throughout the impacted region.

125.  Faced with precisely these sorts of circumstances, the USEPA has had to temporarily suspend or modify certain federal fuel content requirements in specified areas, so as to ensure an adequate supply of gasoline to that area.

### Congress Has Enacted Broad-Ranging Oxygenate Mandates.

126.  In 1990, Congress comprehensively amended the Clean Air Act. As part of those amendments, Congress created two broad-ranging programs which required petroleum refiners to blend oxygenates into gasoline sold throughout much of the country.

127.  One oxygenate mandate program Congress enacted in 1990 is commonly known as the "Oxy-Fuel Program" ("OFP"), codified at 42 U.S.C. § 7545(m). Under the OFP, in every area of the country deemed by the USEPA to have not achieved the requisite status with regard to atmospheric carbon monoxide levels, all gasoline sold is required to contain 2.7 percent by weight oxygen during no less than the four months in which ambient carbon monoxide concentrations are highest.

128.  The OFP went into effect in 1992. The OFP requirements remain in effect today. Many significant urban centers, together with their surrounding areas, are subject to OFP requirements.

129.  Under 42 U.S.C. § 7545(m), it is illegal to sell non-oxygenated gasoline in areas covered by the OFP requirements when they are in effect.

-31-

130. The other oxygenate mandate program Congress enacted in 1990 is commonly known as the "Reformulated Gasoline Program" ("RFGP"), codified at 42 U.S.C. § 7545(k). Section 7545(k) required the USEPA to promulgate regulations regarding fuel content which:

> Shall require the greatest reduction in emissions of ozone forming volatile organic compounds . . . and emissions of toxic air pollutants . . . achievable through the reformulation of conventional gasoline, taking into consideration the cost of achieving such emissions reductions, any nonair quality and other air-quality related health and environmental impacts and energy requirements.

131. Although Congress directed the USEPA to develop specific regulations, it set general parameters with which those regulations needed to comply. Among the seven criteria enacted, Congress specifically required that all reformulated gasoline contain at least 2 percent oxygen by weight.

132. The RFGP requirements went into effect at the beginning of 1995 in those areas designated by the USEPA, as well as in areas of States which voluntarily applied to the USEPA for participation in the RFGP. RFGP requirements apply or have applied in areas of the following States: California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Texas, Wisconsin, and Virginia.

133. Unlike the OFP requirements, RFGP requirements remain in effect year-round. Consequently, all gasoline sold in RFGP areas throughout the year must meet the statute's oxygen content requirements.

134. Under 42 U.S.C. § 7545(k), it is illegal to sell non-reformulated gasoline (*i.e.*, gasoline without an oxygenate), in areas covered by the RFGP requirements.

135. Congress was well aware, when it enacted these oxygenate mandates, that only a small number of oxygenated compounds could be blended with gasoline to achieve the minimum oxygen levels set.

136. Congress knew, when it enacted these oxygenate mandates, that petroleum refiners would have to blend MTBE into at least some of the gasoline sold in OFP and RFGP areas in order to comply with these program requirements. Indeed, both Congress and EPA fully understood that MTBE would be used in the vast majority of oxygenated gasoline sold in the United States. See 136 Cong. Rec. S 6383, 6384 (1990) (remarks of Sen. Daschle) ("EPA predicts that the amendment will be met almost exclusively by MTBE"). One Congressional estimate stated that "the MTBE market is expected to expand by more than 20 percent every year for the next five years" as a result of the Clean Air Act amendments. 136 Cong. Rec. S. 2280, 2289 (1990) (remarks of Sen. Daschle). See also *See also* 136 Cong. Rec. S 17773-74 (remarks of Sen. Daschle) ("the [RFG] program ... will jointly mean that well more than 25 percent of our Nation's gasoline will contain oxygenates, including ethanol, ETBE, MTBE, and other oxygenates"); 136 Cong. Rec. H 12934 (remarks of Mr. Oxley) ("the oxygenated fuels program will allow for the use of MTBE and ethanol as additives to achieve the required level of oxygen"); 136 Cong. Rec. H 2764 (remarks of Mr. Alexander) ("you don't have to use ethanol to meet the requirements. You can use other additives like MTBE"); 136 Cong. Rec. S 6459 (remarks of Sen. Daschle) (discussing the increased costs of gasoline complying with Clean Air Act on the assumption that MTBE would be used).

137. Congress intended to affirmatively encourage the use of MTBE for these purposes. For instance, the percentage weight requirements for oxygen were amended during the Senate's consideration of the 1990 Clean Air Act amendments, to ensure that refiners could use

MTBE, as opposed to some other oxygenate, to meet the oxygenate mandate requirement. Conference Report, Clean Air Act Amendments of 1990, 1990 CAA Leg. Hist. 1451, 1787 ("[t]he agreement establishes an oxygen content level of 2.7 percent in 44 cities with carbon monoxide pollution, starting in 1992. These provisions will encourage the use of oxygen-containing additives like ethanol and MTBE, a natural gas derivative"); 136 Cong. Rec. S 16954 (1990) (remarks of Sen. Chafee) (RFG Program "will encourage the use of oxygen-containing additives like ethanol and MTBE"); 136 Cong. Rec. S 17514 (1990) (remarks of Sen. Heinz) ("reformulated gasoline will also encourage the use of oxygen-containing additives like ethanol and MTBE"). In fact, Congress viewed the increased use of oxygenates like MTBE as "good for energy security and our balance of trade, as well as the environment" because RFG with a 15% MTBE by volume content required 15% less gasoline. 136 Cong. Rec. S 3513 (1990) (remarks of Sen. Daschle).

138. In short, in enacting the oxygenate mandates, Congress wanted petroleum refiners to use MTBE in gasoline. *See, e.g.*, 136 Cong. Rec. S. 3513, 16954, 16922, 17252, and 17514 (1990) (comments of Sens. Daschle, Chafee, Durenberger, Heinz, and Simpson, all recognizing the desirable anticipated need to use MTBE to meet requirements).

139. Congress was also aware that efforts to comply with its new oxygenate mandates for fuel content could have a serious impact on gasoline supplies on a national, regional and local level. Consequently, Congress authorized the USEPA to delay each of the OFP and RFGP requirements for up to two or three years, respectively, if the Administrator determined that domestic supplies of compliant gasoline were inadequate. 42 U.S.C. §7545(k)(6)(B) & (m)(2).

**USEPA Has Approved Only a Limited Number of Oxygenates.**

140. After the passage of the Clean Air Act amendments in 1990, the USEPA began considering regulations for the implementation of both the OFP and RFGP requirements. The

USEPA engaged in a "regulatory-negotiation" process to develop these regulations. This process involved the active participation of the USEPA and recognized stakeholders – petroleum refiners, environmental groups, etc. – in negotiations relating to the details of how each program should be implemented.

141.  In 1991, the USEPA approved only the following compounds as additives to achieve the requisite oxygen content in gasoline for the OFP: MTBE, ethanol, methanol, tertiary amyl methyl ether ("TAME"), ethyl tertiary butyl ether ("ETBE"), tertiary butyl alcohol ("TBA"), and diisopropyl ether ("DIPE"). *Proposed Guidelines for Oxygenated Gasoline Credit Programs Under Section 211(m) of Clean Air Act as Amended*, 56 Fed. Reg. 31154, 31164 (July 9, 1991).

142.  Section 7545 required the USEPA, in considering the additives to be approved for use to meet the oxygenate mandates, to evaluate and take into account both air quality and other non-air quality impacts of approving a particular oxygenate. In this regard, it is important to note that the USEPA was apprised and aware of all of the non-air quality environmental characteristics of MTBE of which the state court plaintiffs now complain before the USEPA approved the use of MTBE as an oxygenate. For instance, the USEPA had been repeatedly advised, and had just as often acknowledged internally, that MTBE had been detected in various groundwater sources in the areas where it had been used and, where confirmed, presented different risk and remediation issues than impacts from conventional gasoline components alone. With this information in hand and having internally, thoroughly considered these issues, the USEPA approved the use of MTBE to meet Congress' oxygenate mandates.

143.  Like Congress, the EPA understood that MTBE would be "the most common oxygenating compound" used by refiners to comply with the CAA's new air emissions

standards. *Approval and Promulgation of Implementation Plan*, 56 Fed. Reg. 5458, 5465 (Feb. 11, 1991).

144. In 1994, EPA reaffirmed its approval of MTBE by formally certifying MTBE as an acceptable oxygenate for the RFG program. See 40 C.F.R. § 80.46. Notably, the EPA again acknowledged that "[g]iven present and projected conditions, EPA . . . expects that MTBE and ethanol will be the most commonly used oxygenates during Phase I of the [RFG] program." *Final Rule, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716, 7732 (Feb. 16, 1994). The other six oxygenates approved for use in the OFP were the only other oxygenates available for use in the RFGP.

145. The USEPA began implementing the OFP requirements in 1992. Pursuant to Section 7545(m), the Administrator considered and approved changes to State Implementation Plans to require the use of oxygenated fuels in nonattainment areas for carbon monoxide.

146. RFGP requirements went into effect on January 1, 1995.

147. Thus, to refine, distribute, or market gasoline in any area subject to OFP or RFGP requirements, consistent with the USEPA regulations, refiners must include at least one of the approved oxygenates in gasoline at the requisite concentration.

148. In promulgating its requirements for the RFGP, the USEPA also specifically and expressly concluded that its regulations of fuel content preempted State law relating to the content of such fuel.

**Plaintiffs Must Use MTBE to Comply with Federal Requirements.**

149. The USEPA has repeatedly recognized that many refiners must, as a practical matter, blend MTBE into gasoline to comply with the USEPA's fuel content requirements.